JS 44   (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Universal Pharmacy Services, LLC d/b/a Apovia Pharmacy Services

**DEFENDANTS**
Frontera Healthcare Network

**(b)** County of Residence of First Listed Plaintiff     Delaware County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant     Concho County
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)* Alan R. Gries, Esquire, Evan H. Holland, Esquire, FBT Gibbons LLP, One Logan Square, 130 N. 18th Street, Phila., PA 19103, 215-665-0400

Attorneys *(If Known)* Carol S. Harding Esquire/Douglas F. Johnson, Esquire Earp Cohn P.C., 121 South Broad, Suite 1720, Philadelphia, PA 19107 215-963-9520

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [ ] 3  Federal Question *(U.S. Government Not a Party)*
- [ ] 2  U.S. Government Defendant
- [X] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [X] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [X] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | **PERSONAL INJURY** [ ] 365 Personal Injury - Product Liability | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | [ ] 368 Asbestos Personal Injury Product Liability | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | **PERSONAL PROPERTY** [ ] 370 Other Fraud | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 371 Truth in Lending | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [X] XXX 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 380 Other Personal Property Damage | | [ ] 485 Telephone Consumer Protection Act |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice | [ ] 385 Property Damage Product Liability | **SOCIAL SECURITY** [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | | **LABOR** [ ] 710 Fair Labor Standards Act | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | [ ] 720 Labor/Management Relations | [ ] 863 DIWC/DIWW (405(g)) | [ ] 890 Other Statutory Actions |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | [ ] 740 Railway Labor Act | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 751 Family and Medical Leave Act | [ ] 865 RSI (405(g)) | [ ] 893 Environmental Matters |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 790 Other Labor Litigation | | [ ] 895 Freedom of Information Act |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 896 Arbitration |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | **PRISONER PETITIONS** **Habeas Corpus:** | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | [ ] 463 Alien Detainee | | [ ] 950 Constitutionality of State Statutes |
| | [ ] 448 Education | [ ] 510 Motions to Vacate Sentence | | |
| | | [ ] 530 General | | |
| | | [ ] 535 Death Penalty **Other:** | **IMMIGRATION** [ ] 462 Naturalization Application | |
| | | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | |
| | | [ ] 550 Civil Rights | | |
| | | [ ] 555 Prison Condition | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | |

## V. ORIGIN *(Place an "X" in One Box Only)*
- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. 1332

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:
- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $ 484,000**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   X Yes   [ ] No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE
March 5, 2026

SIGNATURE OF ATTORNEY OF RECORD
/s/ Carol S. Harding, Esquire

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNIVERSAL PHARMACY SERVICES, LLC
d/b/a APOVIA PHARMACY SERVICES,

     *Plaintiff,*

   v.

                               Civil Action No. 2:26-CV-00179

FRONTERA HEALTHCARE NETWORK,

     *Defendant.*

### ENTRY OF APPEARANCE

Please enter the appearance of Carol S. Harding, Esquire on behalf of Frontera

Healthcare Network in the above-captioned matter.

Respectfully submitted,

Dated:  March 5, 2026

       /s/ *Carol S. Harding*
       Carol S. Harding (#67142)
       **EARP COHN P.C.**
       121 S. Broad Street, Suite 1720
       Philadelphia, PA  19107
       csharding@earpcohn.com
       (215) 963-9520
       (215) 963-9620 (Facsimile)
       Attorneys for Defendant Frontera Healthcare
       Network

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNIVERSAL PHARMACY SERVICES, LLC
d/b/a APOVIA PHARMACY SERVICES,
  *Plaintiff,*

  v.

FRONTERA HEALTHCARE NETWORK,
  *Defendant.*

Civil Action No. 2:26-CV-00179

## DEFENDANT FRONTERA HEALTHCARE NETWORK'S ANSWER TO PLAINTIFF'S ORIGINAL COMPLAINT AND COUNTERCLAIMS

Defendant Frontera Healthcare Network ("Frontera"), answers Plaintiff Universal Pharmacy Services, LLC d/b/a Apovia Pharmacy Services' ("Apovia") Original Complaint as follows:

### INTRODUCTION

1.   Denied.

2.   Denied.

3.   Denied.

### THE PARTIES

4.   Admitted.

5.   Admitted.

### JURISDICTION AND VENUE

6.   Admitted.

7.   Admitted.

8.   Admitted.

## STATEMENT OF FACTS

9.    Admitted.

10.    Admitted.

11.    Admitted.

12.    Admitted.

13.    Admitted.

14.    Admitted.

15.    Admitted.

16.    Admitted.

17.    Admitted.

18.    Admitted.

19.    Admitted.

20.    Admitted.

21.    Denied.

22.    Admitted.

23.    Denied.

24.    Denied.

25.    Denied.

26.    Denied.

27.    Denied.

28.    Denied.

29.    Denied.

30. Denied.

31. Denied.

32. Denied.

33. Denied.

34. Denied.

35. Admitted.

36. Denied.

37. Denied.

38. Denied.

39. Denied.

40. Denied.

## COUNT I

41. Defendant repeats and re-alleges its responses to the allegations contained in the foregoing paragraphs of the complaint as if set forth fully herein.

42. Admitted.

43. Denied.

44. Denied.

45. Denied.

46. Denied.

47. Denied.

ATTORNEYS' FEES AND EXPENSES

48.     Defendant repeats and re-alleges its responses to the allegations contained in the foregoing paragraphs of the complaint as if set forth fulling herein.

49.     Denied.

50.     Denied.

WHEREFORE, Defendant Frontera Healthcare Network demand judgment in its favor and against Plaintiff Apovia Pharmacy Services on all counts of Plaintiff's complaint, together with attorney's fees, costs of suit, and such other and further relief as the court may deemed to be appropriate.

## DEFENSES

51.     Apovia's claims are barred, in whole or in part, by promissory estoppel. Apovia repeatedly agreed to terminate the Pharmacy Management Services Agreement ("PMSA"), and Frontera reasonably relied on such agreement to its detriment.

52.     Apovia's claims are barred, in whole or in part, by the doctrine of waiver. Apovia knowingly relinquished any right to enforce the remaining term of the PMSA by repeatedly agreeing to terminate the contract.

53.     Apovia's claims are barred, in whole or in part, by the doctrine of laches. Apovia unreasonably delayed asserting any right to continued fees while Frontera relied on Apovia's consent to termination and incurred transition and remediation costs.

4

54.     Apovia's claims are barred, in whole or in part, by fraud. Apovia's claims are barred, in whole or in part, by fraud because Apovia made false representations regarding its performance capabilities and competence, understanding of and compliance with applicable laws, staffing capacity, and later intent to terminate the PMSA, which induced Frontera to enter the PMSA, continue performance, and forgo earlier termination for cause.

55.     Apovia's claims are barred, in whole or in part, by failure of consideration. Apovia failed to provide the pharmacy management services as required under the PMSA, including adequate staffing, compliance, and operational performance that formed the basis of Frontera's payment obligations under the PMSA.

56.     Apovia's claims are precluded by reliance. Frontera reasonably relied on Apovia's agreement to terminate the PMSA.

57.     Frontera reserves the right to plead additional defenses or respond in more detail to Apovia's Complaint as further investigation and discovery are conducted.

## COUNTERCLAIMS

Frontera, for its counterclaims against Apovia, alleges as follows:

### JURISDICTION

58.     The Court has subject matter jurisdiction over Frontera's counterclaims under 28 U.S.C. § 1367(a) because they are so related to the Apovia's

claims that they form part of the same case or controversy under Article III of the United States Constitution.

59. The Court also has subject matter jurisdiction over Frontera's counterclaims under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the parties are citizens of different states.

## VENUE

60. Venue is proper pursuant to the Agreement in which Apovia and Frontera agreed and submitted to the exclusive jurisdiction of the federal and state courts of Pennsylvania with respect to disputes arising out of the Agreement.

## PARTIES

61. Frontera is a nonprofit corporation organized under the laws of the State of Texas with its principal place of business located at 604 Eaker Street, Eden, Texas 76837.

62. Apovia is a limited liability company organized under the laws of Delaware with its principal place of business located at 313 Henderson Drive, Sharon Hill, Pennsylvania 19079.

## FACTS

63. Frontera is a federally qualified health center ("FQHC") that provides primary and preventative healthcare to rural, underserved communities in Brady, Fredericksburg, Junction, Mason, and Menard, Texas.

6

64.     As part of its services, Frontera participates in the 340B Drug Program under the Public Health Service Act ("340B Program"), which allows Frontera to offer discounted outpatient drugs to patients at Frontera's on-site pharmacies.

65.     Apovia is a pharmacy management services company.

66.     Apovia represented to Frontera that it had the "expertise and resources" to manage 340B pharmacies for FQHCs. *See* Exhibit 1, Pharmacy Management Services Agreement, at p. 1.

67.     Based on these representations, on September 15, 2023, Frontera and Apovia entered into the PMSA by which Frontera hired Apovia to operate Frontera's pharmacy in Junction, Texas.

## KEY TERMS OF THE PARTIES' AGREEMENT

68.     Under the PMSA, Apovia agreed to provide and manage all "Pharmacy Services" at Frontera's Junction pharmacy, which the PMSA broadly defines as "the rendering of all professional advice and comprehensive pharmacy services customarily provided by a pharmacy to [patients] or as otherwise required by law." *Id.* at § 1(m) and Exhibit A § 2(b).

69.     As part of such services, Apovia agreed to (i) dispense pharmaceuticals, (ii) implement technological solutions to create efficiencies, (iii) develop and implement written policies and procedures necessary to provide the Pharmacy Services, and (iv) provide and manage provision of patient education and outreach about the pharmacy offerings and drug therapy management. *Id.* at Ex. A § 2(b).

7

70.    Apovia promised to employ, staff, and schedule enough pharmacists, managers, technicians, and personnel necessary to provide its services in compliance with "any operational legal or regulatory requirements" and Frontera's "patient care standards." *Id.* at Ex. A § 2(a).

71.    Apovia represented that its pharmacy staff would have all necessary and appropriate training, licenses, and certifications. *Id.*

72.    Apovia also agreed to provide its services in "a manner consistent with good business practice" and "in compliance with all applicable laws," including "the standards, rules and regulations of HHS and any other federal, state or local government agency" that licenses the pharmacy or reimburses for its services. Ex. 1 at § 4(a) and Exhibit A.

73.    The PMSA incorporates a Business Associate Agreement ("BAA") as required by the Health Insurance Portability and Accountability Act ("HIPAA").

74.    Under the BAA, Apovia further promised to (i) protect all Protected Health Information ("PHI") from misuse and unauthorized disclosure, and (ii) return or destroy all copies of PHI upon termination of the PMSA. *Id.* at§ 7(b) and Exhibit E.

75.    The parties agreed that failure to protect PHI "shall be a basis for immediate termination of [the PMSA]." *Id.* at § 7(b).

76.    The initial term of the PMSA was three years. *Id.* at § 6(a)

8

77.    However, the PMSA permitted either party to terminate at any time "based on the fraud, negligence, or material breach by the other party" with thirty days' notice and opportunity to cure. *Id.* at § 6(e).

### APOVIA'S MANAGEMENT FAILURES

78.    Apovia thoroughly mismanaged the pharmacy from the outset, resulting in financial losses, regulatory issues, and patient harm.

79.    ***Multiple Dispensing Errors.*** Apovia made several serious mistakes when dispensing medications, sending at least one patient to the emergency room with symptoms of severe nausea, vomiting, and low blood sugar.

80.    For instance, on or around November 22, 2023, Apovia dispensed a patient's medication to the wrong patient due to its own mislabeling error, jeopardizing the health of both patients.

81.    Following this error, and upon information and belief, Apovia did not conduct or communicate any incident investigation, retraining, corrective action, or process change to Frontera.

82.    Then on or around August 14, 2024, Apovia dispensed the wrong dosage of Ozempic to a patient.

83.    The dosage Apovia dispensed was at least *four times* larger than the patient's prescription.

84.    The patient took the medication, had a serious adverse reaction, and had to be taken to the emergency room for treatment.

9

85.     The error was in part caused by an Apovia employee apparently misreading the patient's prescription and entering the wrong dosage.

86.     As discussed further below, the pharmacy was also understaffed on the day in question despite repeated warnings and requests for assistance from an Apovia pharmacist.

87.     Upon information and belief, Apovia again did not conduct or communicate any incident investigation, retraining, corrective action, or process change to Frontera.

88.     *Understaffing.* Apovia consistently failed to maintain adequate pharmacy staffing, creating unsafe operating conditions and shifting staffing burdens to Frontera.

89.     Apovia promised to fully and safely staff the pharmacy with its own employees.

90.     But Apovia frequently left the pharmacy understaffed and without key personnel.

91.     Despite Frontera's repeated requests to Apovia for staffing ratios, Apovia never provided any to Frontera.

92.     Apovia also regularly asked Frontera to provide its own employees or obtain contractors to cover pharmacy operations when Apovia's employees were unavailable.

93.     Apovia's employees repeatedly warned Apovia about understaffing issues and asked Apovia to hire more personnel.

10

94.     For instance, weeks prior to the August 14, 2024 dispensing error described above, an Apovia pharmacist repeatedly warned Apovia for weeks that the pharmacy would be understaffed on August 14 when a pharmacy technician would be out.

95.     The pharmacist alerted Apovia that August 14 could be a "patient safety issue" and requested that Apovia provide remote assistance on that date from an off-site technician.

96.     Apovia denied the pharmacist's request for remote assistance.

97.     Apovia then *added* to the pharmacist's responsibilities on August 14 by assigning them to begin training a new technician-in-training on that date.

98.     Again, on August 14, Apovia dispensed Ozempic to a patient that was dosed four times stronger than the patient's prescription, ultimately sending that patient to the emergency room.

99.     Upon information and belief, Apovia did not hire any additional employees or adjust its procedures in response to this incident.

100.    Because of Apovia's failure to safely operate the pharmacy, Frontera took charge of staffing oversight at the pharmacy, recruited temporary PRN 'as needed' pharmacists, and even began cross-training Frontera employees as pharmacy technicians to cover future Apovia's staffing gaps.

101.    *Missing Medication.* On or around March 14, 2024, Apovia reported that at least twenty tablets of Hydrocodone, a Schedule II controlled substance, were missing from the pharmacy.

11

102.    Upon information and belief, after the substance went missing, Apovia did not complete any incident closure or root-cause analysis, and its only corrective action was to remove the involved pharmacist.

103.    Frontera had to conduct its own investigation to ensure compliance with state and federal laws, which included drug screenings and video review.

104.    ***Refusal to Provide MTM Services.*** MTM services are specialized consultations in which a pharmacist assesses a patient's medications for problematic interactions, efficacy, and potential cost-savings.

105.    MTM services are reimbursable by Medicare Part D and other programs.

106.    Frontera offered MTM services at the Junction pharmacy before the PMSA.

107.    Between late 2023 and April 2024, Frontera repeatedly asked Apovia to offer MTM services to patients at the Junction pharmacy.

108.    Apovia refused, complaining that MTM services were too time-consuming in relation to the reimbursement amount.

109.    Because of Apovia's refusal, Frontera had to use its own staff to offer MTM services internally to Junction patients, diverting them from other key tasks.

110.    Ultimately, the lack of sufficient operational capacity that resulted from Apovia's refusal caused Frontera to discontinue MTM services to Junction patients.

**111.    *No Written Policies.*** Apovia failed to develop, implement, and maintain written policies and procedures necessary for the safe and compliant operation of the Junction pharmacy.

112.    For instance, on or around October 3, 2024, an Apovia pharmacist sought to terminate a patient relationship.

113.    The Apovia pharmacist notified Frontera and asked for guidance on how to proceed.

114.    Frontera directed the pharmacist to report this to Apovia and follow its applicable policy.

115.    When the pharmacist sought direction from Apovia regarding the termination, Apovia admitted it had no applicable policy and redirected responsibility to Frontera, requiring Frontera to intervene and manage the termination process.

116.    Upon information and belief, Apovia also did not maintain written policies or procedures addressing other recurring and foreseeable operational risks at the pharmacy, including understaffing, medication dispensing errors, missing drugs, or incident investigation.

117.    ***Low Prescription Capture Rate.*** The pharmacy's in-house prescription capture rate remained consistently low and below economic viability during Apovia's tenure.

13

118. Prescription "capture rate" refers to the percentage of prescriptions written by Frontera's providers that are actually filled and dispensed by the in-house pharmacy, as opposed to being filled at outside pharmacies.

119. When negotiating the PMSA, Apovia represented to Frontera that it would achieve a strong in-house prescription capture rate through effective pharmacy management, including education and training of pharmacy staff and guidance on shifting services to an in-house pharmacy.

120. But under Apovia's management, the pharmacy's in-house prescription capture rate remained consistently low at approximately 25–30 percent.

121. A capture rate at that level undermined the pharmacy's financial viability and defeated a central purpose of the PMSA.

122. Frontera repeatedly raised concerns with Apovia regarding the low capture rate and worked collaboratively with Apovia to attempt to improve prescription capture through operational and workflow changes.

123. Despite those efforts, Apovia failed to implement effective management strategies to increase prescription capture, and capture rates never materially improved.

124. *Failure to Designate PIC.* Apovia failed to ensure that the pharmacy always had a properly designated and registered Pharmacist-in-Charge ("PIC") as required by law.

14

125. Class A pharmacies like Frontera's Junction pharmacy must always "have one pharmacist-in-charge who is employed on a full-time basis[.]" Tex. Admin. Code § 291.32(a).

126. On or around April 2025, Apovia's registered PIC resigned.

127. Apovia failed to timely designate and register a replacement PIC.

128. As a result, the pharmacy operated for weeks without a registered PIC, leaving it without required leadership and out of compliance.

129. During this period, Apovia did not provide meaningful interim oversight or compliance support to address the absence of a PIC.

130. Frontera was forced to mitigate the regulatory and operational risk created by Apovia's failure by paying for overlapping pharmacist coverage and assuming oversight responsibilities that Apovia was obligated to perform.

131. *Unlawful Removal of Sensitive Records.* Apovia improperly removed original pharmacy records and protected health records from the pharmacy.

132. Texas law requires pharmacies to maintain certain prescription, controlled substances, and inventory records on-site and available for inspection and copying. *See, e.g.*, Tex. Admin. Code § 291.34(a)-(b) (records requirements for Class A pharmacies); Tex. Admin. Code § 291.17(a) (controlled substance inventory requirements).

15

133. And HIPAA requires covered entities like pharmacies and their business associates to safeguard PHI from unauthorized disclosures. *See, e.g.*, 45 C.F.R. § 164.306(a).

134. On or around May 13, 2025, and after Frontera provided notice of termination and Apovia agreed to such termination (as discussed further below), an Apovia pharmacist removed certain pharmacy records from the pharmacy without Frontera's authorization.

135. These records included PHI and dispensing and inventory records that the pharmacy was required to maintain and protect.

136. When Frontera discovered the records were removed, it immediately and repeatedly demanded that Apovia return the records and guarantee destruction of any copies.

137. Apovia did not return the records for over two months.

138. Finally, on July 15, Apovia's General Counsel sent Frontera an affidavit from the pharmacist testifying they mailed the records back to Frontera. Frontera eventually did receive the mailed records.

139. ***Fraudulent Registration as PIC.*** After Frontera provided notice of termination and expressly instructed Apovia not to act on its behalf, Apovia's pharmacist improperly attempted to register themselves as the Junction pharmacy's PIC.

140. As discussed further below, Frontera terminated the PMSA and notified Apovia and its personnel to refrain from acting on Frontera's behalf, effective May 29, 2025.

141. Upon such date, Apovia no longer had authority to manage pharmacy operations or represent the pharmacy to regulators.

142. Despite that express directive, on or around June 9, 2025, an Apovia pharmacist submitted a registration to the Texas State Board of Pharmacy designating themselves as the pharmacy's PIC.

143. The registration was submitted without Frontera's knowledge or consent.

144. Because of this unauthorized registration, Frontera spent additional time and resources to prepare corrected regulatory filings and mitigate compliance risk.

145. ***Unauthorized Technology Fees.*** During the sales process, Apovia's sales representatives represented to Frontera that all technology fees were wrapped into Apovia's fees for pharmacy management services.

146. On or around January and February 2024, Apovia invoiced Frontera for monthly 'technology' fees.

147. Around this same time period, Frontera began experiencing issues accessing the software used to manage the Junction pharmacy, making it unable to monitor Apovia's operations.

17

148. Frontera questioned these unexplained technology fees and software access issues in a meeting with Apovia on or around February 2024.

149. Apovia did not adequately explain or remedy either issue, impairing Frontera's pharmacy oversight and causing Frontera to overpay Apovia.

### TERMINATION OF AGREEMENT

150. On March 18, 2025, Frontera met with Apovia's leadership and expressed frustration with Apovia's constant mismanagement and errors.

151. During that meeting, Apovia acknowledged Frontera's concerns and agreed to take specific corrective actions within an agreed timeline, including a follow-up meeting to occur no later than March 24, 2025.

152. But Apovia failed to conduct the promised follow-up meeting, failed to timely communicate corrective measures, and ultimately failed to implement any meaningful remediation after the March 18 meeting.

153. On April 8, 2025, Frontera's Chief Financial Officer Kelly Christie had a call with Apovia's Executive Vice President Betty Ngo to discuss Frontera's dissatisfaction.

154. On this call, Ms. Ngo agreed to mutually terminate the PMSA.

155. Ms. Ngo also represented that Apovia would begin planning for the transition of pharmacy management services to a different company.

156. This never occurred; Apovia failed to meaningfully engage in transition planning and continued to exhibit the same management and compliance deficiencies that necessitated termination.

18

157.    After receiving no adequate response or remediation from Apovia following the parties' April 8 agreement, Frontera provided Apovia with formal written notice on April 29, 2025 terminating the PMSA, effective thirty days later on May 29.

158.    Three days later on May 2, Frontera's CFO Ms. Christie attended a conference call with Apovia's VP Ms. Ngo and its Chief Executive Officer, Scott Seidelmann.

159.    On this call, Mr. Seidelmann presented a plan to continue the parties' relationship, but Ms. Christie declined.

160.    Mr. Seidelmann then reaffirmed Apovia's agreement to terminate the PMSA.

161.    Apovia now disputes it ever agreed to terminate the PMSA and seeks unpaid fees for the PMSA's remaining term.

162.    Frontera files these counterclaims to recover damages directly caused by Apovia's gross mismanagement of the Junction pharmacy.

## FIRST COUNTERCLAIM – BREACH OF CONTRACT

163.    Frontera repeats and re-alleges the allegations in paragraphs 57 through 160 as if set forth fully herein.

164.    Apovia is liable to Frontera for breach of contract.

165.    Apovia and Frontera entered into the PMSA, under which Apovia agreed to provide and manage pharmacy services at Frontera's Junction pharmacy in exchange for a management fee.

19

166.    Frontera fully performed by paying Apovia the management fee through the date it terminated the PMSA for cause.

167.    Apovia repeatedly and materially breached the PMSA.

168.    Apovia committed several dispensing errors, including dispensing the wrong medication and dosage, violating its obligation to render pharmacy services "consistent with good business practice" and comply with applicable law.

169.    Apovia repeatedly left the pharmacy understaffed, violating its obligation to schedule and staff the pharmacy "as appropriate and necessary to meet any operational legal or regulatory requirements," retain "personnel necessary to comply with the Frontera's patient care standards," and comply with applicable law.

170.    Apovia allowed controlled substances to go missing without adequate controls or remediation, violating its obligation to operate in "good business practice" and comply with applicable law.

171.    Apovia refused to provide Medication Therapy Management services, violating its obligation to provide "all professional advice and comprehensive pharmacy services customarily provided by a pharmacy" and to "provide and/or manage the provision of patient ... education and outreach about ... drug therapy management."

172.    Apovia failed to "develop and implement written policies and procedures" governing pharmacy operations, patient relationships, safety, and

20

incident response, violating its obligation to develop and implement "written policies and procedures related to the provision of Pharmacy Services."

173. Apovia failure to improve the pharmacy's prescription capture rate, violating its obligation to manage the pharmacy in a manner inconsistent with "good business practice."

174. Apovia failed to register a new PIC after the previous PIC resigned, violating its obligation to staff sufficient qualified personnel and comply with applicable laws.

175. Apovia removed pharmacy records containing PHI and controlled-substance documentation, violating its obligation to comply with applicable law, to safeguard PHI, and to and return PHI upon termination.

176. Apovia caused a pharmacist to register as PIC without authorization, violating its obligation to comply with applicable law and to act only within the scope of its contractual authority.

177. Apovia charged unauthorized technology fees, violating its obligation to provide its own technological solutions as part of its services, and to only charge the fees outlined in PMSA Exhibit B.

178. As a direct and proximate result of Apovia's breaches, Frontera suffered compensatory and consequential damages of at least $589,859.50, not including attorneys' fees and expenses.

## ATTORNEYS' FEES AND EXPENSES

21

179.   Frontera repeats and re-alleges the allegations contained paragraphs 57 through 176 as if set forth fully herein.

180.   Frontera is entitled to recover its reasonable attorneys' fees pursuant to PMSA Section 8(a), which requires Apovia to reimburse Frontera for its expenses, including reasonable attorneys' fees and expenses, arising from or related to Apovia's provision of management services under the PMSA.

## JURY DEMAND

181.   Frontera demands a trial by jury on all issues triable by a jury.

## PRAYER

Defendant Frontera Healthcare Network requests that Plaintiff take nothing by its claims, that the Court dismiss Plaintiff's Complaint with prejudice, that Frontera recover on its counterclaims all relief to which it is entitled, and that the Court grant Frontera all such further relief as the Court seems just.

Respectfully Submitted,

**NICHOLS WEITZNER THOMAS LLP**

*/s/ Scott Nichols*
Scott Nichols
Texas Bar No. 14994100
snichols@nwtlaw.com
Gregorio "Greg" Flores
Texas Bar No. 24116367
gflores@nwtlaw.com
2402 Dunlavy Street, Suite 2000
Houston, Texas 77006
-and-
22

Douglas F. Johnson (ID No. 40036)
Carol S. Harding (ID No. 67142)
**EARP COHN P.C.**
121 South Broad, Suite 1720
Philadelphia, PA  19107
(215) 963-9520
dfjohnson@earpcohn.com
csharding@earpcohn.com

*Attorneys for Defendant Frontera Healthcare Network*

23